**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**BRANDI CHARLES ROSE,**

      **Plaintiff,**

**v.**                          **Case No.: 2:16-cv-12369**

**NANCY A. BERRYHILL,
Acting Commissioner of the
Social Security Administration,**

      **Defendant.**

## <u>PROPOSED FINDINGS AND RECOMMENDATIONS</u>

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The matter is assigned to the Honorable John T. Copenhaver, Jr., United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 10, 17, 18). The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's motion for judgment on the pleadings be **GRANTED**, to the extent that it requests remand of the Commissioner's decision; that the Commissioner's motion for judgment on the pleadings be **DENIED**; that the

decision of the Commissioner be **REVERSED**; that this matter be **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g); and that this case be **DISMISSED**, **with prejudice,** and removed from the docket of the Court.

## I.    <u>Procedural History</u>

On June 24, 2013, Plaintiff, Brandi Charles Rose ("Claimant"), completed an application for DIB, alleging a disability onset date of June 1, 2010, due to "Factor 5 clotting disorder," post-traumatic stress disorder, chronic obstructive pulmonary disease ("COPD"), a "seizure disorder, severe major depressive disorder, urinary cystitis, urinary cytosis/kidney disease, chronic pneumonia/bronchitis, fibromyalgia," and a tumor on her left femur and knee. (Tr. at 170-71, 208). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 90-94, 98-100). Claimant filed a request for an administrative hearing, which was held on June 1, 2015, before the Honorable Carrie Bland, Administrative Law Judge ("ALJ"). (Tr. at 30-66).  By written decision dated October 21, 2015, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 14-24). The ALJ's decision became the final decision of the Commissioner on October 21, 2016, when the Appeals Council denied Claimant's request for review. (Tr. 1-6).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 8, 9). Both parties filed memoranda in support of judgment on the pleadings. (ECF Nos. 10, 17, 18). Consequently, the issues are fully briefed and ready for resolution.

## II.    Claimant's Background

Claimant was 36 years old on her alleged onset date and 38 years old on her date last insured. (Tr. at 22). She completed three years of college and communicates in English. (Tr. at 207, 209). In the past, Claimant worked as a relationship banker and independent insurance agent. (Tr. at 41, 60-61, 209).

## III.    Summary of ALJ's Decision

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 404.1520. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite

3

the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the fifth and final step in the process, that the claimant is able to perform other forms of substantial gainful activity when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at every level in the administrative review," including the review performed by the ALJ. 20 C.F.R. § 404.1520a. First, the ALJ evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* § 404.1520a(b). If such impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social

functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 404.1520a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 404.1520a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual function. *Id.* § 404.1520a(d)(3).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through March 31, 2012. (Tr. at 16, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since June 1, 2010, her alleged onset date, through her date last insured. (*Id.,* Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "COPD, affective disorder (bipolar disorder), chronic pain syndrome, seizure disorder, and migraine headaches." (Tr. at 16-17, Finding No. 3). The ALJ also considered Claimant's hypertension, degenerative disc disease, irritable bowel syndrome, diabetes mellitus type II, anxiety disorder/post-traumatic stress disorder, alcohol dependence in remission, and anemia, but determined that these impairments were non-severe. (Tr. at 16-17). Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 17-18, Finding No. 4). Accordingly, the ALJ determined

that Claimant possessed:

> [T]he residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant can occasionally climb ramps and stairs, can never climb ladders, ropes or scaffolds; and can occasionally balance, stoop, kneel, crouch, and crawl. The claimant must avoid even moderate exposure to irritants such as fumes, odors, gases, dust, and poorly ventilated areas, as well as dangerous hazards such as moving machinery and unprotected heights. The claimant can perform work that is limited to simple, routine, and repetitive tasks.

(Tr. at 18-22, Finding No. 5).

At the fourth step, the ALJ found that Claimant was unable to perform any past relevant work (Tr. at 22, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with her RFC to determine her ability to engage in substantial gainful activity. (Tr. at 22-23, Finding Nos. 7-10). The ALJ considered that (1) Claimant was defined as a younger individual aged 18-49 on the date last insured (2) she had at least a high school education and could communicate in English; and (3) transferability of job skills was not material to the disability determination. (Tr. at 22-23, Finding Nos. 7-9). Given these factors and Claimant's RFC, with the assistance of a vocational expert, the ALJ concluded that Claimant could perform jobs that existed in significant numbers in the national economy. (Tr. at 23, Finding No. 10). Claimant could work as a sorter or merchandise worker at the light exertional level and as a new account interviewer at the sedentary exertional level. (*Id*). Therefore, the ALJ found that Claimant was not disabled and was not entitled to benefits. (Tr. at 23, Finding No. 11).

## IV.    <u>Claimant's Challenge to the Commissioner's Decision</u>

Claimant asserts two challenges to the Commissioner's decision. First, she contends that the ALJ did not include mental restrictions in her RFC to account for her

moderate difficulties in concentration, persistence, or pace. (ECF No. 10 at 4-7). Claimant notes that although the ALJ restricted her RFC to "simple, routine, and repetitive tasks," the Fourth Circuit Court of Appeal's ("Fourth Circuit") holding in *Mascio v. Colvin*, 780 F.3d 632, 638 (4th Cir. 2015), and subsequent cases established that such restriction does not account for moderate limitations in concentration, persistence, or pace. (*Id.* at 6-7).

Second, Claimant argues that the ALJ performed an inadequate step three analysis because she did not (1) identify any specific listings that she considered for Claimant's physical impairments or (2) compare any of the medical evidence of Claimant's physical impairments to the listing criteria. (*Id.* at 8). Claimant specifically contends that the ALJ should have compared the signs and symptoms of Claimant's seizure disorder to listing 11.02 (Epilepsy), and her respiratory, cardiac, and hematological conditions to listings 3.00, 4.00, and 7.00, respectively. (*Id.* at 9). In support of this argument, Claimant cites the holdings in *Radford v. Colvin*, 734 F. 3d 288 (4th Cir. 2013), and *Fox v. Colvin*, 632 F. App'x 750 (4th Cir. 2015). (*Id.* at 8-9).

In response to Claimant's arguments, the Commissioner states that the ALJ appropriately analyzed and supported her RFC findings, adequately explained her conclusions, and posed hypothetical questions to the vocational expert that included all of Claimant's limitations. (ECF No. 17 at 7-8). As to Claimant's second challenge, the Commissioner contends that the record does not support a finding that she met any of the listings cited in her brief. (*Id.* at 9-11).

## V.   <u>Relevant Evidence</u>

While the undersigned has reviewed all evidence of record, only the notations most relevant to the disputed issues are summarized below:

### A. Seizure Disorder

Claimant testified at the administrative hearing that she first became ill in 2009, but was "able to manage" and continue working as an independent insurance agent. (Tr. at 42). She had kidney issues, a blood clotting disorder, immunodeficiency, and began "passing out." (Tr. at 43). In 2010, she started having "grand mal seizures" on a daily basis. (*Id.*). She suffered two to eleven seizures per day throughout the relevant period from her onset date of June 1, 2010 to her date last insured on March 31, 2012. (Tr. at 48). She stated that she became unable to work full time primarily due to the seizures and her COPD. (Tr. at 45). Her seizures, which lasted up to two minutes, caused her to lose consciousness and control of her body. (Tr. at 49-50, 52). Afterward, she felt like she was "hit by a Mack truck." (Tr. at 53). Since the seizures began, she experienced memory deficits, fatigue, and trouble completing tasks. (Tr. at 53-54). She felt that what used to take her a day to accomplish now took her a week. (Tr. at 54). Her anti-seizure medication helped, but she continued to have breakthrough seizures. (*Id.*).

On July 23, 2010, Claimant presented to the Emergency Room at Pikeville Medical Center, reporting that she experienced convulsions, which she described as seizures, two times per day over the past two to three weeks. (Tr. at 1086, 1092). She was assessed with convulsions not elsewhere classifiable and admitted to the hospital. (Tr. at 1086). The CT scan of her head without contrast showed unremarkable intracranial structures, no abnormal intra-axial or extra-axial lesions, no shift of the midline structures, and the visible ventricular system and cisterns were within normal limits. (Tr. at 1090). Claimant was administered Ativan, an anti-anxiety medication; Dilantin, an anticonvulsant; and Toradol, a nonsteroidal anti-inflammatory drug. (Tr. at 1083). She was discharged the following day with a diagnosis of epilepsy, not

8

otherwise specified, without mention of intractable epilepsy.[1] (Tr. at 1086).

Shortly thereafter, on August 4, 2010, Claimant presented to the Emergency Room at King's Daughters Medical Center, stating that she continued to have seizures despite taking Dilantin. (Tr. at 1285, 1290). She asserted that Dilantin reduced the frequency of her seizures from four-to-five times per day to two-to-three per day. (Tr. at 1290). The episodes began with confusion, irritability, and numbness after which she began to see "spots;" hear and feel a rushing sensation; shake all over, having what appeared to be tonic clonic contractions of her arms, legs, and head; and lose consciousness. (Tr. at 1287, 1290). After the episodes, she was confused, shaking, and had severe headaches. (*Id.).* She also lost bowel and bladder control during two of the episodes. (*Id.*).

During her admission to the hospital, Claimant underwent an electroencephalogram. The photic stimulation caused her head and body to twitch, but the electrographic pattern of her brain did not concurrently change, indicating that she was having a pseudoseizure that was non-epileptic in nature. (Tr. at 1285, 1293, 1296). Therefore, the attending neurologist diagnosed Claimant with conversion disorder and obtained a psychiatric consultation.[2] (Tr. at 1295). Claimant was evaluated by Jawaid Latif, M.D., the consulting psychiatrist, who ultimately gave Claimant a prescription of an anti-epileptic medication, Lamictal, in an effort to reduce the symptoms of

---

[1] Intractable epilepsy is "a seizure disorder in which a patient's seizures fail to come under control with treatment." https://www.urmc.rochester.edu/neurosurgery/for-patients/conditions/intractable-epilepsy.aspx

[2] Conversion disorder is a form of somatization in which physical symptoms that resemble those of a neurological disorder are triggered by mental factors. https://www.merckmanuals.com/home/mental-health-disorders/somatic-symptom-and-related-disorders/conversion-disorder. The symptoms, which are often associated with episodes of stress and conflict, are not consciously produced by the individual. *Id.* The symptoms may resemble a seizure, paralysis of limbs, loss of senses, or cognitive problems. *Id.*

conversion disorder symptoms and the associated headaches. (*Id.*). Dr. Latif documented that Claimant was currently experiencing stress due to a recent relocation and ongoing health problems. (Tr. at 1290, 1294). During her admission, she reportedly experienced an episode in which she stiffened all over in front of the nursing staff when they encouraged her to get up and walk in the hall. (Tr. at 1322). Dr. Latif instructed Claimant to follow up with a psychiatrist after discharge, stressing that her convulsive episodes were not "true seizures," but rather were symptoms of conversion disorder, a psychiatric illness. (Tr. at 1320, 1324).

On January 10, 2011, Claimant was admitted to King's Daughters Medical Center for abdominal pain and complaints following gynecological surgery. (Tr. at 1470). She reported to the nursing staff that she recently had seizures and required a private room or she would experience more episodes. (Tr. at 1469-70). The following day, she advised that she had a seizure due to uncontrolled pain. (Tr. at 1468). The next day, she alerted a nurse who arrived to dispense her pain medication that she was going to have a seizure and started moaning loudly and "tossing and turning" in the bed. (Tr. at 1467). When the nurse turned on the overhead light, Claimant reportedly closed her eyes, stopped moving, and became alert and oriented after 30 seconds. (*Id.*).

On March 2, 2011, Claimant had a MRI of her brain without contrast at Pikeville Medical Center due to her new onset of seizures. (Tr. at 1117). The examination was limited by motion artifact and was unremarkable. (*Id.*). The following month, on April 5, 2011, Claimant was admitted to Williamson Memorial Hospital after she reported that she suffered a series of seizures. (Tr. at 1119, 1122). She was transferred to Pikeville Medical Center on April 8, 2011 for further monitoring. While there, Claimant reported that she had suffered at least seven seizures since her initial admission that were

worsening in severity and frequency. (*Id.*). She described feelings of confusion, lethargy, fatigue, muscle aches, and chest pain after the seizures. (*Id.*). Claimant also stated that the seizures began two years earlier, and she was treated by neurologist, Samrina Hanif, M.D. (*Id.*). Claimant was diagnosed with non-epileptic seizures and discharged on April 11, 2011 to follow up with Dr. Hanif. (Tr. at 1118, 1123). Her radiology reports and epilepsy monitoring study were all normal. (Tr. at 1140-42, 1144).

On May 23, 2011, Claimant saw her primary care physician, Muneel Abbas, M.D., at Williamson Family Care Center. (Tr. at 728). Dr. Abbas noted that Claimant had a seizure disorder and assessed her with epilepsy. (Tr. at 728-29).

### B. Respiratory, Cardiac, and Hematological Conditions

Claimant testified that she was prone to chronic and severe lung infections, which usually resulted in an admission to the hospital for intravenous antibiotics. (Tr. at 45). She further stated that, during the relevant period, she was diagnosed with three pulmonary embolisms that had micro-hemorrhaged, causing both of her lungs to fill with blood. (Tr. at 46). This medical event required her to spend approximately one week in the Intensive Care Unit at St. Mary's Medical Center, after which she was on bedrest for six months and required daily services from a home health care nurse. (Tr. at 46-47).

Claimant also testified that genetic testing performed in 2011 revealed that she had "Factor V" blood clotting disorder for which she was placed on Coumadin.[3] (Tr. at 47). However, Claimant stated that Coumadin was not effective and she began receiving Lovenox shots twice per day. (Tr. at 48). Claimant indicated that her "blood issues" caused significant fatigue to the point that she had to use a hospital bed for six months

---

[3] Factor V Leiden is a mutation of one of the clotting factors in the blood called factor V, which can increase the chance of developing abnormal blood clots (thrombophilia), usually in the veins. http://www.mayoclinic.org/diseases-conditions/factor-v-leiden/basics/definition/con-20032637

because she could not make it upstairs to her bedroom. (Tr. at 51). Her doctor instructed her at that time not to lift more than two pounds due to her risk of blood clots. Given these issues, Claimant spent most of her time sitting, although she did attempt to take a walk around the house with her mother in the afternoons to avoid being completely sedentary. (Tr. at 51-52). During the relevant period, Claimant tried to work as a contracted independent insurance agent in-between hospital stays, but she was unable to continue working. (*Id.*). She further stated that her conditions required her to be implanted with an inferior vena cava filter (ICV filter) in 2011 to prevent pulmonary embolisms. (Tr. at 55-56).

According to Claimant's treatment records, she presented to King's Daughters Medical Center on August 4, 2010 complaining of seizures. At that time, Barbara M. Michael, M.D., noted that Claimant did not really have any chronic medical problems other than "maybe ... some [COPD] or asthma." (Tr. at 1287). Claimant denied shortness of breath, wheezing, cough, or history of chest pain at that time. (*Id.*). Dr. Michael told Claimant to continue using her prescribed inhalers. (Tr. at 1288). On March 2, 2011, Claimant presented to Dr. Abbas, reporting that she had a fever, cough, congestion, and headaches. (Tr. at 739). Dr. Abbas assessed Claimant with an upper respiratory infection and acute bronchitis. (Tr. at 740).

On May 23, 2011, Dr. Abbas found that Claimant's COPD was stable on the current medical regime. (Tr. at 673). He instructed Claimant to continue using her albuterol and levalbuterol inhalers. (Tr. at 674). On August 19, 2011, Claimant presented to Williamson Memorial Hospital complaining of chest pain for the past two days, as well as abdominal pain. (Tr. at 2391). Her respiratory and cardiovascular examinations were normal, and a chest x-ray showed no evidence of acute disease. (Tr. at 2392-93,

2395). The clinical impression was atypical chest pain. (Tr. at 2393). Claimant was given pain medication and instructed to follow up with Dr. Abbas. (*Id.*). On October 24, 2011, Claimant presented to Dr. Abbas with complaints of progressive COPD, particularly over the past month. (Tr. at 653). She reported coughing and shortness of breath. (*Id.*). Dr. Abbas diagnosed Claimant with an acute exacerbation of COPD. (Tr. at 654). She was prescribed Medrol steroid tablets and an antibiotic, Zithromax. (*Id.*).

The following month, on November 28, 2011, Claimant presented to the emergency room at Williamson Memorial Hospital complaining of cough, chest congestion, fever, and shortness of breath that began three to four days earlier. (Tr. at 2374). She was admitted to the hospital and received intravenous antibiotics and an anti-inflammatory glucocorticoid, as well as nebulizer treatments and Mucinex. (Tr. at 2366). Her chest x-rays on November 28 and 30, 2011 showed no active disease. (Tr. at 2382-83). Nonetheless, Claimant did not respond well to treatment. For that reason, a CT scan of her chest was performed on December 1, 2011 to rule out a pulmonary embolism. (Tr. at 2366). The chest CT scan showed that Claimant indeed had a moderate-sized pulmonary embolism in the main artery of the right upper lobe and in a segment of the left upper lobe, which were non-obstructing. (*Id.*; Tr. at 2384). She was diagnosed with bilateral pulmonary emboli, acute exacerbation of COPD, and probable bilateral interstitial pneumonia, with a differential diagnosis of hemorrhaging in her lungs. (Tr. at 2366). Claimant was transferred to St. Mary's Medical Center for tertiary care. (*Id.*). At St. Mary's Medical Center, she was placed on a Heparin drip with a plan to start Coumadin for her pulmonary emboli. She was given Recephin for probable pneumonia, and steroids were ordered for an acute exacerbation of COPD. (Tr. at 1743).

On December 28, 2011, Claimant presented to the emergency room at Williamson Memorial Hospital complaining of right pleuritic chest pain that worsened with deep inspiration and palpitation. (Tr. at 2344). She also complained of having shortness of breath and becoming fatigued quite frequently. (*Id.*). Claimant reported that she had seen Dr. Abbas recently and learned that her anti-coagulant was sub-therapeutic; accordingly, her Coumadin dosage was increased. (*Id.*). Claimant was receiving home health nursing care to help her with physical therapy status post pulmonary emboli. (*Id.*).

Claimant followed up with Dr. Abbas on January 10, 2012. (Tr. at 651). She stated that she did not have any issues following her discharge from the hospital for treatment of pulmonary emboli. (*Id.*). On examination, her breathing was unlabored and she had normal breath sounds. (*Id.*). Dr. Abbas continued the Coumadin. (Tr. at 652). Later that month, on January 27, 2012, Claimant presented to Williamson Memorial Hospital, complaining of chest pain for the past week. (Tr. at 2327). Her chest x-ray showed no acute disease; her EKG showed normal rate and rhythm; there was no evidence of acute ischemia or injury; and her cardiac enzymes were normal. (*Id.*). The attending physician felt that Claimant's chest pain was musculoskeletal in nature and most likely due to her recent pulmonary embolisms. (Tr. at 2325).

### C. Evaluations and Opinions

On August 16, 2013, Paula J. Bickham, Ph.D., completed a psychiatric review technique form, noting that Claimant submitted a prior application for DIB benefits in 2011; at that time, a psychologist evaluated Claimant under listings 12.04 (affective disorders) and 12.07 (somatoform disorders). (Tr. at 76). The prior psychologist found that Claimant had limitations in social and cognitive functioning. (*Id.*). Dr. Bickham

stated that there was "insufficient evidence to evaluate a change in the claimant's condition" from the adjudication of that claim on July 6, 2011 to Claimant's date last insured.[4] (*Id.*). On December 3, 2013, G. David Allen, Ph.D., agreed that there was insufficient evidence to reevaluate Claimant's claim. (Tr. at 85).

## VI.    Scope of Review

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In Blalock v. Richardson, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a de novo review of the evidence to ascertain whether the claimant is disabled. Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001)). Instead, the Court's role is limited to insuring that the ALJ followed applicable regulations and rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

---

[4] Dr. Bickham did not provide any additional information regarding the prior psychologist's findings, which are not contained in the record.

## VII. <u>Discussion</u>

Claimant argues that the ALJ committed reversible error in two ways: (1) she failed to conduct a proper analysis at step three of the disability evaluation; and (2) she failed to adequately address all of Claimant's established limitations when determining Claimant's RFC. In support of her first argument, Claimant points to the copious records detailing Claimant's seizure disorder, which the ALJ determined was a severe impairment. Claimant complains that, despite this substantial evidence, the ALJ never compared Claimant's symptoms to the severity criteria of listing 11.02 (epilepsy). Claimant emphasizes "the ALJ's shortcut around her obligation at step 3 of the sequential process," by adding that the ALJ ignored *all* of Claimant's medically determinable physical impairments when conducting the requisite analysis. Claimant asserts that her respiratory, cardiac, and hematologic conditions should also have been examined against listings 3.00 (respiratory disorders), 4.00 (cardiovascular disorders), and 7.00 (hematological disorders), respectively. (ECF Nos. 10 at 9-10, 18 at 3).

With respect to her second challenge, Claimant contends that the ALJ failed in the RFC finding to adequately address one of Claimant's established limitations. To determine the severity of Claimant's mental impairments, the ALJ reviewed the three broad categories of functioning found in paragraph B. The ALJ determined that Claimant had moderate limitations in maintaining concentration, persistence, or pace. Claimant argues that, nonetheless, the ALJ failed to include restrictions in the RFC finding to fully account for these limitations. Furthermore, the ALJ failed to explain why additional restrictions related to Claimant's deficits in maintaining concentration, persistence, or pace were unnecessary. For support, Claimant primarily relies on the Fourth Circuit's decision in *Mascio, supra*. Each challenge will be addressed in turn.

16

### A.  Step Three Analysis

To appreciate Claimant's criticism of the ALJ's step three analysis, the Court must first examine the ALJ's findings at step two. At the second step of the sequential process, the ALJ determined that Claimant suffered from five severe impairments: COPD, affective disorder (bipolar disorder), chronic pain syndrome, seizure disorder, and migraine headaches. (Tr. at 16). The ALJ further concluded that a number of other medical conditions alleged by Claimant were not severe, because they did not significantly limit Claimant's ability to do work-related activities. The ALJ did not reference any particular pieces of evidence to support her step two findings, but proceeded on to the next step of the process.

At step three, the ALJ was required to again assess the severity of Claimant's impairments to determine whether they met or medically equaled one or more of the listings in Appendix 1 of 20 C.F.R. Part 404, Subpart P. *See* 20 C.F.R. § 404.1520(a)(4)(iii). In this circuit, "where there is factual support that a listing could be met," the ALJ must consider whether the claimant's impairment meets or equals the relevant listing. *Huntington v. Apfel*, 101 F.Supp.2d 384, 390 (D. Md. 2000) (citing *Cook v. Heckler,* 783 F.2d 1168, 1172 (4th Cir. 1986)). "The ALJ's analysis must reflect a comparison of the symptoms, signs, and laboratory findings concerning the impairment, including any resulting functional limitations, with the corresponding criteria set forth in the relevant listing." *Id.* at 390-91; *see, also, Ezzell v. Berryhill*, 688 Fed. Appx. 199, 200 (4th Cir. 2017) ("When there is 'ample evidence in the record to support a determination' that the claimant's impairment meets or equals one of the listed impairments, the ALJ must identify 'the relevant listed impairments' and compare 'each of the listed criteria to the evidence of the claimant's symptoms.'") (citing *Cook*, 783 F.2d

17

at 1172-73) (internal markings omitted).

As is the case throughout the sequential evaluation process, the ALJ must set forth the reasons for her step three determination. *See, e.g.*, *Radford v. Colvin*, 734 F. 3d 288, 295 (4th Cir. 2013) ("A necessary predicate to engaging in substantial evidence review is a record of the basis for the ALJ's ruling.") (citing *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984)). An ALJ's explanation is insufficient if it only states that the ALJ considered the listing of impairments and offers nothing to reveal *why* the ALJ made his or her determination. *Fox v. Colvin*, 632 F. App'x 750, 755 (4th Cir. 2015) ("Our circuit precedent makes clear that it is not our role to speculate as to how the ALJ applied the law to its findings or to hypothesize the ALJ's justifications that would perhaps find support in the record."). Likewise, it is generally unacceptable for an ALJ to summarily conclude that a claimant does not have an impairment or combination of impairments that meets a listing; the ALJ's decision must include a discussion that applies the pertinent legal requirements of the listing to the record evidence. *Radford*, 734 F.3d at 295. When evidence exists that a claimant meets a disability listing, but the evidence is rejected without discussion, '"insufficient legal analysis makes it impossible for a reviewing court to evaluate whether substantial evidence supports the ALJ's findings."' *Coe v. Berryhill,* No. 1:15CV1077, 2017 WL 886858, at *3 (M.D.N.C. Mar. 6, 2017) (quoting *Bailey v. Colvin,* No. 1:14CV303, 2015 WL 5227646, at *3 (M.D.N.C. Sept. 8, 2015)). While an "ALJ is not required to explicitly identify and discuss every possible listing", the ALJ "is compelled to provide a coherent basis for [the] Step Three determination." *Ezzell*, 688 F. App'x at 200 (citation omitted).

Nevertheless, "if the ALJ's opinion read as a whole provides substantial evidence to support the ALJ's decision at step three, such evidence may provide a basis for

upholding the ALJ's determination." *McDaniel v. Colvin*, No. 2:14-CV-28157, 2016 WL 1271509, at \*4 (S.D.W. Va. Mar. 31, 2016) (quoting *Smith v. Astrue*, 457 Fed. Appx. 326, 328 (4th Cir. 2011) ("Reading the ALJ's decision as a whole, substantial evidence supports the finding at step three of the sequential evaluation process as the ALJ's analysis at subsequent steps of the evaluation are inconsistent with meeting [the listing]." Indeed, "the ALJ need only review medical evidence once in his opinion." *Id.* at \*4 (quoting *McCartney v. Apfel*, 28 Fed.Appx. 277, 279 (4th Cir. 2002)). Ultimately, "[a] cursory explanation in step three is satisfactory so long as the decision as a whole demonstrates that the ALJ considered the relevant evidence of record and there is substantial evidence to support the conclusion." (*Id.*) (quoting *Smith*, 457 Fed. Appx. at 328). Simply put, the written decision must demonstrate that the ALJ adequately performed all of the key tasks required by the sequential disability evaluation process. When the record includes conflicting evidence, or facts suggesting that the claimant might meet a listing, the ALJ's discussion is particularly important.

Here, the ALJ's step three analysis is wholly inadequate. While the ALJ performed a review of Claimant's mental impairments, comparing them to the criteria of listings 12.04 (affective disorders), 12.06 (anxiety-related disorders), and 12.09 (substance addiction disorders), she did not consider Claimant's physical conditions at all. (Tr. at 17). The ALJ's failure to mention Claimant's seizure disorder, COPD, and chronic pain, notwithstanding her prior conclusion that these conditions were severe impairments, leaves the Court to wonder whether the ALJ viewed the evidence as insufficient to find Claimant's physical conditions met or equaled a listing, or whether she simply overlooked the conditions at the time of her analysis. If the ALJ felt that a step-three assessment of Claimant's physical conditions was unnecessary, she should

have provided her rationale for that determination. Unfortunately, because the ALJ did not provide even a cursory explanation at step three, her subsequent discussion of the evidence pertaining to Claimant's seizures, COPD, and chronic pain syndrome does not establish that she actually considered those conditions in the context of a listed impairment. Moreover, as the evidence concerning these conditions is by no means consistent, a focused discussion is necessary. Otherwise, the Court is left to reconcile the factual discrepancies and perform the comparison.

The insufficiency of the ALJ's step three analysis is especially evident in her treatment of Claimant's seizure disorder. As Claimant points out, the record contains numerous entries detailing Claimant's seizure activity, assessment, and treatment. Claimant testified that she suffered two to eleven seizures per day during the relevant period. (Tr. at 48). She stated that each seizure lasted up to two minutes, causing her to lose consciousness and control over her body; afterward, she felt like she had been "hit by a Mack truck." She reported having ongoing issues with her memory, suffering from chronic fatigue, and having trouble completing tasks. (Tr. at 53-54).

Claimant's medical records reflect that she was hospitalized several times for evaluation of her seizures during the approximate two year period at issue. (Tr. at 1086, 1119, 1122, 1285). During Claimant's first admission to the hospital for seizures in July 2010, she underwent a CT scan, which failed to identify any neurological source of her seizures. (Tr. at 1090). She was diagnosed with "epilepsy not otherwise specified." (Tr. at 1086). During an August 2010 admission, Claimant was administered an electroencephalogram. In the middle of the procedure, Claimant began convulsing; however, the electrographic pattern of her brain did not change. (Tr. at 1285, 1296). Based on this incongruity, Claimant was diagnosed with conversion disorder, a

somatoform disorder in which psychological factors are expressed as physical symptoms. Claimant's treating neurologist advised Claimant that her seizures were not "true seizures," but were actually caused by a psychiatric illness that would require follow-up treatment by a specialist. (Tr. at 1295, 1320). In March 2011, an MRI of Claimant's brain was unremarkable. (Tr. at 1117). In April 2011, Claimant was again admitted to the hospital and diagnosed with non-epileptic seizures. (Tr. at 1118). Her radiology reports and epilepsy monitoring study were normal during this admission. (Tr. at 1140-42, 1144). Contrary to the diagnostic findings, however, Claimant's primary care physician diagnosed Claimant in May 2011 with epilepsy. (Tr. at 728-29).

What is most striking about this evidence is the divergence of opinion over the nature and cause of Claimant's seizures. Some of the treating physicians diagnosed Claimant with epilepsy, a neurological disorder that would be compared to listings 11.02 or 11.03 (epilepsy). Other treating physicians diagnosed Claimant with conversion disorder or pseudo-seizures, a psychiatric condition that would be compared to listing 12.07 (somatoform disorders). To perform an appropriate Listing comparison, the ALJ certainly should have addressed and probably should have resolved this diagnostic inconsistency; but, the ALJ never expressly acknowledged or reconciled the fundamental contradiction. Indeed, the ALJ failed to even mention the diagnosis of conversion disorder, much less explain how and if the ALJ evaluated Claimant's seizures as symptoms of conversion disorder at step three of the process. Had the ALJ considered Claimant's seizures through the lens of a somatoform disorder, the ALJ may have reevaluated the severity of Claimant's deficits under the paragraph B criteria.

Without some acknowledgement by the ALJ that Claimant's seizures were considered in the context of a somatoform disorder, the Court is unable to conclude that

the ALJ's analysis is valid. While the ALJ certainly *may* have reconciled the various pieces of evidence and concluded that Claimant did not meet listings 11.02, 11.03, or 12.07, the record does not reflect even a trace of such an analysis. The complete lack of discussion and support for the ALJ's step three analysis regarding Claimant's COPD, chronic pain syndrome, and, in particular, her seizure disorder, render the ALJ's decision incapable of meaningful review.

Accordingly, the undersigned **FINDS** that the ALJ erred in her step three analysis. Because an adequate step three analysis would oblige the Court to parse through the record and make evidentiary determinations, this case must be remanded to allow the ALJ to perform that required analysis. *Fox*, 632 Fed. Appx at 755 (4th Cir. 2015) (holding that the district court may not engage in the "fact-finding expedition ... [and] analysis that the ALJ should have done in the first instance.")

### B. RFC Finding

In *Mascio*, the ALJ determined that the claimant had moderate difficulties in maintaining concentration, persistence, or pace; however, the ALJ failed to include any mental limitations in the controlling hypothetical question presented to the vocational expert. 780 F.3d at 637-38. While the vocational expert supplied a list of jobs that were unskilled, the Fourth Circuit found that this was insufficient to account for the claimant's moderate mental limitations and held that "an ALJ does not account 'for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work.'" *Id.* at 638 (quoting *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011)). The Court indicated that "the ability to perform simple tasks differs from the ability to stay on task. Only the latter limitation would account for a claimant's limitation in concentration,

persistence, or pace."[5] *Id.* Because the ALJ failed to either include any mental limitation in the RFC or explain why a "moderate limitation in concentration, persistence, or pace at step three d[id] not translate into a limitation" in the ALJ's RFC finding, the Fourth Circuit found that remand was appropriate. *Id.*

The same issue was addressed by this Court in *Jackson v. Colvin*, No. 3:14-cv-24834, 2015 WL 5786802, at *4-*5 (S.D.W. Va. Sept. 30, 2015). There, the ALJ found that the claimant experienced moderate deficiencies in concentration, persistence, or pace. *Id.* at *1. Attempting to take this limitation into account, the ALJ restricted the claimant to work involving simple tasks and instructions; however, the Court recognized that this was inadequate under *Mascio*. *Id.* at *4. The Court noted that "what was pivotal in *Mascio* was not the claims or evidence presented in the agency proceeding, but the ALJ's finding [of moderate difficulties in concentration, persistence, or pace]." *Jackson*, 2015 WL 5786802, at *4. Explaining the principle espoused in *Mascio*, the Court indicated: "If the ALJ found [the claimant] had moderate mental limitations related to concentration, persistence, or pace—which here the ALJ found—the ALJ should have either included those limitations in the hypothetical or explained in the RFC assessment why, despite finding these moderate mental limitations, it was unnecessary to include them in the hypothetical. Failure to do so requires remand." *Id.* Because the ALJ did neither, the Court found that remand was appropriate. *Id.* at *5.

In contrast, this Court subsequently held that *Mascio* did not require remand in *Evans v. Colvin*, No. 14-cv-29072, 2016 WL 1258491 (S.D.W. Va. Mar. 30, 2016). In *Evans*, the ALJ found that the claimant experienced moderate limitations in

---

[5] Listing 12.00 explains that "[c]oncentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings." 20 C.F.R. § 404, Subpart P, App. 1, ¶ 12.00(C)(3).

concentration, persistence, or pace. 2016 WL 1258491, at *5. The ALJ's RFC finding limited the claimant to simple, routine tasks, and the Court found that this restriction accurately reflected the claimant's mental ability. *Id.* In describing the standard for reviewing an argument under *Mascio*, the Court observed that "[w]here the medical evidence shows that a claimant can carry out simple tasks, an ALJ's hypothetical to the vocational expert to that effect will sufficiently account for a claimant's moderate limitation in maintaining concentration, persistence, and pace." *Id.* (quoting *Hurst v. Comm'r of Soc. Sec.*, 522 F. App'x 522, 525 (11th Cir. 2013)) (markings omitted). The Court determined that the claimant's mental health treatment records and the opinion of a state agency medical consultant supported the ALJ's finding that the claimant could perform simple, routine tasks, despite moderate limitation in concentration, persistence, or pace. *Id.* In the end, the Court concluded that "the ALJ explained why [the claimant's] moderate limitation in concentration, persistence, or pace at step three d[id] not translate into a limitation in [the claimant's] residual functional capacity, beyond restricting [the claimant] to unskilled work." *Id.*

Like all of the decisions discussed above, the ALJ found at step three that Claimant was moderately limited in maintaining concentration, persistence, or pace. (Tr. at 17). The ALJ stated that Claimant had physical and mental health concerns, which caused ongoing stressors that "likely affected her ability to concentrate in some fashion." (*Id.*). She also began having seizures which occurred in the context of such stressors which foreseeably caused "as much as moderate issues with this functional domain." (*Id.*). Subsequently, in crafting Claimant's RFC, the ALJ stated that Claimant's "mental symptomology does not encompass more than moderate difficulties, but, coupled with her pain levels, justify a limitation to unskilled work." (Tr. at 22). Therefore, the ALJ

restricted Claimant's RFC to "simple, routine, and repetitive tasks." (Tr. at 18).

As the Fourth Circuit explained in *Mascio*, restricting a claimant to simple instructions alone does not typically account for a moderate limitation in concentration, persistence, or pace. *See Mascio*, 780 F.3d at 638 ("[T]he ability to perform simple tasks differs from the ability to stay on task. Only the latter limitation would account for a claimant's limitation in concentration, persistence, or pace."). When a moderate limitation in maintaining concentration, persistence, or pace is found to exist by an ALJ, the ALJ must explain how that limitation is addressed by the RFC finding or why the limitation does not require an additional restriction in the RFC finding. The ALJ failed to provide such an explanation in this case. In fact, the ALJ failed to provide any substantive analysis of Claimant's concentration, persistence, or pace in her RFC discussion. While she cited evidence that Claimant's mental status was frequently within normal limits, she nevertheless found at step three that Claimant had moderate functional limitations. (Tr. at 20, 22). The ALJ's assertion that Claimant's pain and concentration deficits "justify a limitation to unskilled work" does not address Claimant's ability to stay on task, nor does it explain why other restrictions are not required to account for that deficiency.

As noted by Claimant, the ALJ was obligated to identify her functional limitations and assess her work-related abilities on a function-by-function basis to determine her RFC. (ECF No. 10 at 4). *See* SSR 96-8p. This evaluation required the ALJ to review Claimant's mental abilities such as the capacity to understand, remember, and carry out instructions; respond appropriately to supervision, co-workers, and others; adapt to pressures and changes in a work setting; and stay on task without interruption from psychological issues. SSR 96-8p; 20 C.F.R. § 404.1545. Other than examining the broad

paragraph B categories of functioning, which does not constitute an RFC assessment, the ALJ did not articulate an analysis of Claimant's mental functional abilities or the limitations that flowed from her various impairments.

Undoubtedly, the ALJ may have found that Claimant's moderate limitations did not require further mental restrictions in Claimant's RFC. However, because the ALJ's decision lacks explanation in critical areas, the Court cannot meaningfully review whether her RFC finding is supported by substantial evidence. Furthermore, the undersigned cannot conclude that the ALJ's foregoing errors were harmless. The jobs used to support the ALJ's step five finding (sorter, new account interviewer, and merchandise marker) require some degree of sustained concentration, persistence, or pace. The vocational expert testified that those jobs could *not* be performed by a person who would potentially be off-task for a quarter of the day in addition to regularly scheduled breaks. (Tr. at 64). Clearly, a limitation in concentration, persistence, or pace would directly affect Claimant's ability to perform the jobs identified by the ALJ at step five.

Given the fact that the ALJ's RFC discussion lacks an adequate explanation concerning Claimant's mental limitations and the undersigned cannot conclude that the ALJ's error was harmless, the undersigned **FINDS** that the ALJ's decision at step five is not supported by substantial evidence. *See Morgan v. Barnhart*, 142 F. App'x 716, 720-21 (4th Cir. 2005) ("The Commissioner can show that the claimant is not disabled only if the vocational expert's testimony that jobs exist in the national economy is in response to questions from the ALJ that accurately reflect the claimant's work-related abilities.").

Accordingly, for the reasons stated above, the undersigned **RECOMMENDS** that the Commissioner's decision be **REVERSED** and that this case be **REMANDED**

so that the ALJ may reconsider, or elaborate on, her step three analysis of Claimant's impairments and her RFC assessment with respect to Claimant's moderate limitation in maintaining concentration, persistence, or pace.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **GRANT** Plaintiff's request for judgment on the pleadings, (ECF No. 10), to the extent that it requests remand of the Commissioner's decision; **DENY** Defendant's request to affirm the decision of the Commissioner, (ECF No. 17); **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this PF&R; and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de*

*novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Copenhaver, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:**  September 18, 2017

Cheryl A. Eifert
United States Magistrate Judge